UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ACRO SERVICES LLC, *et al.*,<br><br>Defendants. | RULE 65(B) CERTIFICATION AND DECLARATION OF COUNSEL IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND *EX PARTE* MOTION TO TEMPORARILY SEAL ENTIRE CASE FILE<br><br>(FILED UNDER SEAL) |

I, Margaret Burgess, declare as follows:

1. I am over eighteen years old and am a citizen of the United States. I am one of the attorneys for the Federal Trade Commission ("FTC") in the above-captioned case against ACRO Services LLC, American Consumer Rights Organization, First Call Processing LLC, Music City Ventures, Inc., Nashville Tennessee Ventures, Inc., Reliance Solutions, LLC, Thacker & Associates Int'l LLC, Consumer Protection Resources, LLC (the "Corporate Defendants") and Sean Austin, John Steven Huffman, and John Preston Thompson (the "Individual Defendants," and together with the Corporate Defendants, "Defendants").

2. I am a member in good standing of the bar of the state of Georgia. My business address is 233 Peachtree Street, NE, Ste. 1000, Atlanta, GA 30303. I have personal knowledge of the facts stated herein and, if called to testify, I could and would competently testify to the same.

3. Pursuant to Federal Rule of Civil Procedure 65(b)(1), the FTC has submitted an *ex parte* motion for temporary restraining order with an asset freeze, appointment of a receiver, immediate access, other equitable relief, and order to show cause why a preliminary injunction

1

should not issue ("TRO Motion"), as well as an *ex parte* motion to temporarily seal the case file ("Seal Motion").

4. This Court may issue a temporary restraining order ("TRO") without notice to the defendants if: "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

5. The FTC has not provided Defendants with notice of this action or of the TRO Motion, and for the reasons stated below, the interests of justice require that the FTC's motion be heard *ex parte* and that the docket be sealed temporarily.

### I. Defendants' Unlawful Conduct

6. The evidence set forth in the TRO Motion and accompanying exhibits shows that Defendants have engaged in, and are likely to continue to engage in, deceptive acts and practices in connection with their debt relief scheme, which has taken millions of dollars from consumers.

7. Since at least 2019, Defendants have defrauded consumers into purchasing bogus debt relief services. Through their telemarketing campaign, Defendants falsely promise consumers that they will eliminate or substantially reduce consumers' credit card debts in 12 to 18 months, in exchange for consumers paying a large upfront fee and recurring monthly fees. Defendants tell consumers several other lies to convince them that these services are legitimate and worthwhile, such as: that Defendants are affiliated with a bank, credit card, or credit reporting agency; that consumers will not have to pay the upfront fee charged to their credit cards because the fee is part of the debt being eliminated; and that consumers' credit scores will improve or return to normal after the 12-to-18-month period. Defendants also offer various

2

false or deceptive explanations about how they purportedly eliminate or reduce consumers' debts, such as telling consumers that their credit companies have been over-charging them on interest, that consumers qualify for a debt forgiveness program, or that the credit card companies cannot collect on the debt based on federal laws such as the Fair Debt Collection Practices Act.

8. Defendants further deceive and harm consumers by instructing them to cease all payments to, and communications with, their credit card companies. Defendants mislead consumers into believing that ceasing payments and forwarding communications enables Defendants to work on eliminating or substantially reducing their credit card debts.

9. The reality, as demonstrated in the TRO Motion, is that none of Defendants' representations are true. Defendants neither eliminate nor reduce consumers' debts and instead cause consumers to end up in far worse financial positions—including owing greater debt, having their credit scores drop and not recover, and being sued by their credit card companies after following Defendants' instructions to stop making payments. Defendants have duped individual consumers into paying thousands of dollars for the debt relief services, and overall, it is estimated that Defendants have extracted over $20 million from consumers since 2019 as part of the scam.

10. Defendants' conduct violates Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and multiple provisions of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310. Defendants are likely to continue engaging in this unlawful conduct without the Court entering the FTC's proposed temporary restraining order.

II. *Ex Parte* Relief Is Warranted

11. As explained further in the TRO Motion, the evidence shows that immediate and irreparable harm will occur if the FTC's filings are not under seal and Defendants receive

3

advance notice of this action. To the best of the FTC's knowledge, Defendants are not aware of the FTC's investigation into their illegal activities. The FTC has not given notice to Defendants and respectfully submits that it should not be required to do so, given Defendants' track record of the following: (1) being sued for the debt relief scheme and other fraud, as well as disregarding the legal process; (2) concealing and dissipating assets; and (3) attempting to hide their identities.

12. The Individual Defendants and several Corporate Defendants have been investigated and sued multiple times related to the debt relief scheme, including at least one state administrative action.

   a. In March 2017, a consumer filed a lawsuit in Pennsylvania against Defendant Thacker & Associates Int'l LLC ("Thacker & Associates") regarding several unsolicited telemarketing calls he received that offered debt relief services. *See* Plaintiff's Original Complaint, *Abramson v. Thacker & Associates Int'l, LLC*, Case No. AR-17-001419 (Pa. Ct. C.P. Allegheny Cty. Mar. 20, 2017).[1] Defendants John Preston Thompson ("Thompson") and John Steven Huffman ("Huffman") responded to discovery requests in this matter and identified themselves as the owners of Thacker & Associates, with their mailing address as 503 Ligon Drive, Suite A, Nashville, Tennessee 37204.[2] Again in 2019, this same consumer filed another lawsuit in Pennsylvania against Defendants American

---

[1] A copy of the complaint from this case was filed as an exhibit in the lawsuit *Mey v. Castle Law Group, PC*, Civil Action No. 5:19-CV-185 (N.D. W. Va.) (hereinafter, "*Mey* litigation") and is attached hereto as Attachment A.
[2] Discovery responses from this case were filed as an exhibit in the *Mey* litigation and are attached hereto as Attachment B.

         Consumer Rights Organization and Music City Ventures, Inc. regarding similar unsolicited debt relief calls.[3]

    b. In 2018, the West Virginia Office of the Attorney General conducted an investigation into an "unsecured debt validation" scheme involving a law firm called Tristar Consumer Law, PC[4]—which had been sold to Defendant American Consumer Rights Organization around the same time. During the state's investigation, the law firm's owner, Judson Phillips,[5] provided sworn interrogatory responses stating that on May 17, 2018, the assets of Tristar Consumer Law, PC were transferred to a non-profit organization, which he identified as Defendant American Consumer Rights Organization.[6]

    c. In March 2020, a consumer filed an amended complaint against all three Individual Defendants along with Defendants Music City Ventures, Inc., Nashville Tennessee Ventures, Inc. ("Nashville Tennessee Ventures"), and Thacker & Associates, for violations of the Telephone Consumer Protection Act

---

[3] A copy of the complaint from this case was filed as an exhibit in the *Mey* litigation and is attached hereto as Attachment C.
[4] Copies of documents from this investigation were filed in the *Mey* litigation and are attached hereto as Attachment D.
[5] In August 2018, the Supreme Court of Tennessee suspended Phillips from the practice of law upon finding that he "pos[ed] a threat of substantial harm to the public" and disbarred him after he could not successfully defend himself against over 100 pending disciplinary complaints. *See* Attachment E. Phillips consented to permanent disbarment in 2021 after he was unable to successfully defend further disciplinary complaints. *See* Attachment F. Phillips also was named as a defendant in several of the lawsuits involving timeshare cancellation schemes referenced in Paragraph 14 below.
[6] *See* Attachment D at 22-26. An attorney for Defendant American Consumer Rights Organization also confirmed during the state's investigation that American Consumer Rights Organization, which was initially registered with the Tennessee Secretary of State as Tristar Consumer Law Organization, purchased the assets of Tristar Consumer Law, PC. *Id.* at 27, 50-51.

5

and state consumer laws resulting from the many debt relief telemarketing calls she received. *See* First Amended Complaint, *Mey v. Castle Law Group, PC, et al.*, Civil Action No. 5:19-CV-185 (N.D. W. Va. Mar. 2, 2020), ECF No. 59.[7] In her amended complaint, the consumer alleged that she received unsolicited calls from defendants; that defendants claimed to be affiliated with her credit card company, Citicard; and that defendants sent her a contract for "Unsecured Debt Validation" purporting to charge her a fee of over $2,000.[8] During the discovery period, the consumer plaintiff filed motions to compel and moved for sanctions after defendants failed to respond to her discovery requests and hid relevant information. In ruling on the motions for sanctions, the court found that "defendants have engaged in a pattern of concealing discoverable material," including "conceal[ing] many lawsuits, investigations, and other discoverable material including financial and corporate records."[9] The court also found that defendants failed to obey the court's order to conduct discovery in good faith.[10] In light of defendants' conduct, the court determined that the appropriate sanction was to strike defendants' entire pleadings.[11] Subsequently, the court entered

---

[7] A copy of the First Amended Complaint is attached hereto as Attachment G.
[8] *Id.* at 15.
[9] *See* Attachment H at 3, 9. Copies of court orders from the *Mey* litigation are attached hereto as Attachments H, I, and J.
[10] *See id.* at 9; Attachment I at 4.
[11] *See* Attachment H at 9.

6

default judgment against defendants[12] and ordered them to pay over $800,000 in penalties.[13]

d. In March 2019, the Oregon Department of Consumer and Business Services, Division of Financial Regulation, served an Order to Cease and Desist, Proposed Order Assessing Civil Penalties, and Notice of Right to An Administrative Hearing ("Notice Order") on Defendant American Consumer Rights Organization and other entities found to be operating as part of the same business scheme.[14] The Notice Order found that Defendant American Consumer Rights Organization and other respondents had marketed debt consolidation services to an Oregon consumer in exchange for a fee. The Notice further found that American Consumer Rights Organization and respondents sent a contract to the consumer, which specified that they would "provide debt management services to JH, including: drafting of letters to credit card companies, collection agencies, or credit bureaus; reviewing of any responses to those letters and drafting further responses; assisting with credit report discrepancies; and providing 'best efforts to settle (by means of validation, reduction, and/or adjustment) [JH's] unvalidated debt.'"[15] After respondents failed to respond to the Notice Order, in May 2019 the Department issued a final order, entered by default, which again ordered

---

[12] *See* Attachment I. In the order, the court stated that "a finding of bad faith on the part of the defendants is easily met," given the "wide[] scope of intentional discovery abuse" and the "multiple, repeated opportunities to remedy their conduct." *Id.* at 4-5.
[13] *See* Attachment J. The court found, among other things, that "the calls [to the plaintiff] were misleading" and that "Defendants were on notice to stop their calling and continued throughout this proceeding." *Id.* at 10-11.
[14] A copy of the Notice Order is attached hereto as Attachment K.
[15] *Id.* at 2-3.

7

American Consumer Rights Organization and other respondents to cease and desist state law violations regarding debt management services and also assessed $20,000 in civil penalties.[16]

e. In May 2019, a consumer filed a lawsuit in the U.S. District Court for the Eastern District of California against Defendant American Consumer Rights Organization and others related to unsolicited debt relief calls. *See* Complaint for Damages, *Aussieker v. Nelson*, No. 2:19-CV-00868 (E.D. Cal. May 15, 2019), ECF No. 1.[17] The consumer plaintiff alleged that the defendants, when calling him repeatedly, used false and misleading caller IDs such as "Chase card services," and they stated on the phone that they were with "account services."[18] The plaintiff alleged that defendants sent him a contract regarding debt validation services and attached a copy of a draft contract from American Consumer Rights Organization to his complaint.[19]

f. In September 2020, a consumer filed a lawsuit in Wisconsin against Tri Star Consumer Group (an assumed name of Defendant Music City Ventures, Inc.), Tristar Consumer Law d/b/a American Consumer Rights Organization, and another entity related to credit card debt validation services that were marketed and sold to the consumer. *See* Complaint, *Ziegelbauer v. Tri Star Consumer Group, et al.*, No. 2020CV001808 (Wis. Cir. Ct. Dane Cty. Sep. 1, 2020).[20] The

---

[16] A copy of the Final Order to Cease and Desist and Final Order Assessing Civil Penalties Entered by Default is attached hereto as Attachment L.
[17] A copy of the complaint is attached hereto as Attachment M.
[18] *Id.* at 8-9.
[19] *Id.* at 9, Exhibit A.
[20] A copy of the complaint from this case is attached hereto as Attachment N.

8

consumer plaintiff alleged claims of fraud, misrepresentation, and breach of contract under state law.[21] During discovery, John Steven Huffman filed an affidavit stating that he is the owner of Tri Star Consumer Group.[22] The court ordered default judgment against two defendants, including Tristar Consumer Law, while ultimately dismissing counts against Tri Star Consumer Group due to lack of personal jurisdiction.[23]

13. Despite being sued several times regarding their debt relief scheme, including judgments entered against them, Defendants have continued to operate their scheme under new names. And in at least one of these matters, Defendants have disregarded the legal process by concealing evidence and failing to follow discovery rules and court orders—to such a degree that the court found it an appropriate sanction to strike Defendants' pleadings and ultimately enter a judgment by default.[24]

14. The debt relief scheme is also not the first time Defendants have been involved in deceptive business practices. For years, Individual Defendants John Preston Thompson, John Steven Huffman, and Sean Austin helped run timeshare cancellation scams that resulted in numerous complaints from consumers and lawsuits against the parties involved. For example, between 2017 and 2019, Austin, Thompson, Huffman, and various entities including Nashville Tennessee Ventures were sued for tortious interference with contract and violations of state consumer laws, resulting in multiple court orders enjoining defendants from marketing timeshare

---

[21] *Id.*
[22] A copy of this affidavit is attached hereto as Attachment O.
[23] A copy of the court order entering default judgment is attached hereto as Attachment P. A copy of the court's order dismissing Tri Star Consumer Group is attached hereto as Attachment Q.
[24] *See supra* notes 9-12.

9

cancellation programs to certain homeowners. *See, e.g., Diamond Resorts Int'l, Inc. v. Orlando Ventures, Inc.*, Case No. 6:17-cv-01771 (M.D. Fla. 2017); *Westgate Resorts, Ltd. v. Castle Law Group, P.C.*, Case No. 6:17-cv-01063 (M.D. Fla. 2017); *Wyndham Vacation Ownership, Inc. v. Orlando Ventures, Inc.*, Case No. 6:19-cv-00370 (M.D. Fla. 2019).[25] In 2019, a company also in the timeshare cancellation business sued Huffman, Thompson, and Nashville Tennessee Ventures for various breach of contract claims, including claims that Huffman and Thompson were committing fraud by diverting corporate funds for their personal use. *See Huffman v. Lonestar Transfer, LLC*, No. 05-20-00717-CV, 2021 WL 1608472 (Tex. App. Apr. 26, 2021). In 2019, Huffman, Thompson, and Nashville Tennessee Ventures were sued by former employees for failure to pay wages in accordance with the Fair Labor Standards Act. *See McGill v. Nashville Tenn. Ventures, Inc.*, Case No. 3:19-cv-00922, 2022 U.S. Dist. LEXIS 99489 (M.D. Tenn. June 3, 2022).[26]

15. In addition to being sued many times and disregarding legal process, Defendants have gone to great lengths to conceal and dissipate the money they have received from consumers as part of the debt relief scheme. Since 2019, Defendants have opened at least 14 bank accounts across 5 institutions.[27] The Individual Defendants often receive large payments

---

[25] Copies of certain filings from these cases are attached hereto. *See* Attachment R (permanent injunction entered against Nashville Tennessee Ventures in *Diamond Resorts*); Attachment S (permanent injunction entered against Sean Austin to resolve claims in *Westgate Resorts*, attached as Exhibit A); Attachment T (permanent injunction entered against Nashville Tennessee Ventures, Thompson, and Huffman in *Wyndham Vacation Ownership*). The plaintiffs in the *Westgate Resorts* litigation filed a motion for sanctions against Sean Austin, claiming that he acted in bad faith and made false statements in discovery. *See* Attachment U. The court denied the sanctions motion without prejudice after Austin filed bankruptcy. *See* Attachment V.
[26] Excerpts from the deposition transcript of John Preston Thompson filed in this case are attached hereto as Attachment W.
[27] *See* Agarwal Decl. ¶ 7 & tbl. 1.

from these corporate accounts to their personal accounts.[28]  Moreover, Defendants have opened multiple merchant processing accounts to evade fraud detection programs run by credit card networks.[29]  Despite these attempts, several of Defendants' merchant processing accounts have been terminated due to fraud or excessive chargebacks since 2019; still, Defendants have simply created new accounts and continued funneling consumer payments through them.[30]

16.     The Corporate Defendants have also used several names over the years in attempts to hide their identities.  For example, in the debt relief contracts and other materials that consumers have received from Defendants as part of the scheme, Defendants have transacted business with consumers under a number of different names—including "American Consumer Rights Organization," "ACRO Services, LLC," "Thacker and Associates, Int'l, LLC," "TriStar," and "Church Law Group, LLC."[31]  Multiple consumers have described signing up with one debt relief entity, only to find out months later that the entity now goes by another name.[32]  Moreover, some Defendants have gone so far as to misrepresent who they are: Defendants' contracts often state that consumers are charged monthly fees for a credit report monitoring service provided by Capital Compliance Solutions, which Defendants identify as a "third-party company that has

---

[28] *See id.* ¶¶ 12-13, 15 & tbls. 3, 4.
[29] *See* Memorandum in Support of the FTC's Ex Parte Motion for Temporary Restraining Order with Asset Freeze, Appointment of Receiver, Other Equitable Relief, and an Order to Show Cause Why a Preliminary Injunction Should Not Issue ("TRO Memorandum") at Section II.A.4. In particular, Visa operates various fraud monitoring programs for merchant accounts that process payments over the Visa network, including the Visa Fraud Monitoring Program ("VFMP").  The terms of the VFMP are described in the Visa Product and Service Rules, which are available at https://usa.visa.com/content/dam/VCOM/download/about-visa/visa-rules-public.pdf; relevant excerpts are attached hereto as Attachment X.
[30] *See id.*
[31] *See id.* at Section II.C.1; *see also* Thralls Decl. ¶¶ 3-6 & Att. A (consumer signing up with Thacker & Associates); Ray Decl. ¶¶ 3-8 (consumer signing up with TriStar); McAnarney Decl. Att. C (Defendants' welcome packet showing Church Law Group, LLC and ACRO Services, LLC); Brooks Decl. Att. D at 8 (same).
[32] *See, e.g.*, Thralls Decl. ¶ 13; Lopez Decl. ¶ 11; Ray Decl. ¶ 9.

11

been secured to do this service" and that "is an independent company and has no partnership or relationship with ACRO...."[33] But in reality, Capital Compliance Solutions is simply another name for ACRO Services, and consumer payments made out to Capital Compliance Solutions are deposited into ACRO Services' bank accounts.[34]

17. In the FTC's experience, when individuals and companies engaged in fraudulent conduct (such as Defendants) receive advance notice of an FTC action, they often attempt to undermine the FTC's efforts by dissipating or concealing assets or destroying evidence. The examples below represent prior FTC actions where defendants, after learning of the FTC seeking or obtaining an *ex parte* temporary restraining order, have taken steps to dissipate or conceal assets or destroy evidence.

    a. In *FTC v. Rando*, No. 3:22-cv-00487-TJC-MCR (M.D. Fla. 2022), after obtaining an *ex parte* TRO and asset freeze, the FTC learned that one of the individual defendants who received notice of the TRO attempted to wire $500,000 from a corporate bank account. The transfer was halted due to the TRO's asset freeze provision. In addition, a corporate sales manager who had been served with the TRO remotely logged into one of the Defendants' cloud accounts and began deleting electronically hosted documents.

    b. In *FTC v. Cardiff*, No. 18-cv-2104-DMG-PLA (C.D. Cal. 2020), the FTC sought and obtained an *ex parte* temporary restraining order with a receivership and asset freeze over a business owned and controlled by an individual defendant, who was already under an asset freeze and personal receivership. When the individual

---

[33] *See* Moore Decl. Atts. D at 1, E at 5; McAnarney Decl. Att. C at 6; Halverson Decl. Att. A at 15.
[34] *See* Liggins Decl. ¶¶ 8, 22 & Atts. D, LLL.

12

Case 3:22-cv-00895   Document 6   Filed 11/07/22   Page 12 of 18 PageID #: 164

defendant received actual notice of the temporary restraining order, but before he was served, he rushed to his bank and withdrew $30,000 from an account in the name of another company he wholly owns and controls.

c. In *FTC v. Laptop and Desktop Repair, LLC*, Case No. 1:16-CV-3591-AT (N.D. Ga. 2016), the FTC sought and obtained an *ex parte* TRO with an asset freeze. After learning that the TRO had been granted, one defendant immediately withdrew money and transferred it to a non-defendant limited liability company. And on the day that the court entered a preliminary injunction with an asset freeze, the same defendant paid an online retailer of precious metals $27,486.76 for 32 gold bars. The next day, he transferred $103,000 from an online brokerage account into another personal account and then transferred $74,029.45 from that same brokerage account to purchase an additional 55 gold bars, and, in total, purchased $101,515.90 in precious metals. After the defendant failed to comply with a contempt order issued by the court, the court issued an arrest warrant for the defendant, who by that time, was believed to have left the country. To date, the majority of the funds, including the gold bars, have not been recovered.

d. In *FTC v. E.M.A. Nationwide, Inc.*, No. 12-cv-2394 (N.D. Ohio 2012), the court denied the FTC's request for an *ex parte* temporary restraining order with an asset freeze and required the FTC to serve the defendants before holding a preliminary injunction hearing. The FTC served the defendants on September 28, 2012, and by October 4, 2012, the individual defendants had withdrawn more than $152,000 from a corporate bank account. They had already used some of the funds to retain

13

attorneys and to prepay one individual defendant's apartment rent for three months, all before stipulating to a preliminary injunction with an asset freeze.

e. In *FTC v. Goldman Schwartz Inc.*, Case No. 13-cv-00106 (S.D. Tex. 2013), the FTC obtained an *ex parte* TRO with an asset freeze against several corporate and individual defendants, including the companies' owner. Within an hour of being served with the TRO, but before the asset freeze had been fully implemented, the owner withdrew approximately $268,000 from a corporate account subject to the asset freeze. Shortly after, the owner sold approximately $160,000 in securities held in a personal trading account. The next day, the owner's wife withdrew another $18,500 from a non-defendant corporation's account that was subject to the asset freeze. Because the court had issued its asset freeze in advance of these actions, the FTC and a court-appointed monitor were able to recover all of the money.

f. In *FTC v. Asia Pacific Telecom, Inc.*, No. 10-cv-3168 (N.D. Ill. 2010), the FTC obtained an *ex parte* TRO freezing the defendants' assets and prohibiting them from destroying documents. After being served with the TRO, one of the individual defendants deleted an email account used to conduct many of the illegal practices at issue in the FTC's complaint. The individual defendant took this step despite being served with a discovery request by the FTC for documents in the account and despite multiple demands from the court-appointed receiver for access to the account. The court ultimately held the individual defendant in contempt for deleting the account in violation of the TRO.

g. In *FTC v. 4049705 Canada Inc.*, Case No. 1:04-cv-04694 (N.D. Ill. 2004), the FTC filed a complaint and motion for a TRO and asset freeze, with notice to defendants. The defendants made several substantial money transfers after receiving notice of the FTC's action but before the asset freeze was imposed.

h. In *FTC v. National Consumer Counsel*, No. Case No. 8:04-cv-00474-CJC-JWJ (C.D. Cal. 2004), the court granted the FTC's *ex parte* TRO with asset freeze and a temporary receiver against all but one of the corporate defendants. One of the individual defendants then deleted key electronic files on defendants' shared network server by accessing his account through a computer controlled by the corporate defendant not under receivership.

i. In *FTC v. QT, Inc.*, Case No. 1:03-cv-03578 (N.D. Ill. 2003), the defendants, after receiving notice of the TRO, withdrew and transferred more than $2 million from banks that had not yet received notice of the asset freeze.

j. In *FTC v. SkyBiz.com, Inc.*, Case No. 4:01-cv-00396-CVE-FHM (N.D. Okla. 2001), within days of the service of the TRO with an asset freeze, one of the primary defendants convinced an overseas trustee to withdraw $1 million from a foreign affiliate's offshore account. But because a domestic correspondent bank had been served with the TRO, it refused to transfer the funds to the defendant. The money in the offshore account was preserved and ultimately used to provide $20 million for consumer redress.

18. These are only a few of many instances in which the FTC has found that defendants who operate businesses permeated by illegal conduct are likely to dissipate or hide assets and destroy relevant evidence.

15

Case 3:22-cv-00895   Document 6   Filed 11/07/22   Page 15 of 18 PageID #: 167

### III. District Courts Regularly Grant *Ex Parte* Relief in FTC Cases

19. Numerous courts in this District and throughout the Sixth Circuit have granted or affirmed *ex parte* temporary injunctive relief similar to that requested here. *See, e.g., FTC v. One or More Unknown Parties Deceiving Consumers*, Case No. 5:20-cv-02494-SL (N.D. Ohio Nov. 5, 2020) (ECF No. 5) (*ex parte* TRO with asset freeze and immediate access); *FTC v. Repair All PC, LLC*, Case No. 1:17-cv-00869-DAP (N.D. Ohio Apr. 24, 2017) (ECF No. 9) (*ex parte* TRO with asset freeze, appointment of receiver, and immediate access); *FTC v. Career Exams, Inc.*, Case No. 1:12-cv-00188-TBR (W.D. Ky. Nov. 2, 2012) (ECF No. 5) (*ex parte* TRO with asset freeze, immediate access, appointment of monitor); *FTC v. United Benefits, LLC*, Case No 3:10-cv-00733 (M.D. Tenn. Aug. 5, 2010) (ECF No. 12) (*ex parte* TRO with asset freeze, appointment of receiver, and immediate access); *FTC v. Debt Advocacy Center, LLC*, Case No. 1:09-cv-02712-CAB (N.D. Ohio Nov. 19, 2009) (*ex parte* TRO with asset freeze, appointment of receiver, and immediate access); *FTC v. 6253547 Canada, Inc.*, Case No. 1:09-cv-1211-JG (N.D. Ohio Jun. 2, 2009) (ECF No. 6) (*ex parte* TRO with asset freeze and immediate access); *FTC v. Integration Media Inc.*, Case No. 1:09-cv-01776-JG (N.D. Ohio May 28, 2009) (ECF No. 15) (*ex parte* TRO with asset freeze and immediate access); *FTC v. 90107-4021 Quebec, Inc.*, Case No. 1:08-cv-01051-DCN (N.D. Ohio Apr. 25, 2008) (ECF No. 11) (*ex parte* TRO with asset freeze and immediate access); *FTC v. Mazzoni & Son, Inc.*, Case No. 1:06-cv-02385-PAG (N.D. Ohio Oct. 3, 2006) (ECF No. 7) (*ex parte* TRO with asset freeze, appointment of receiver, and immediate access); *FTC v. Success Express, Inc.,* Case No. 1:05-cv-00714-GJO (W.D. Mich. Oct. 18, 2005) (ECF No. 4) (*ex parte* TRO with asset freeze, appointment of receiver, and immediate access); *FTC v. Nat'l Testing Servs. LLC*, Case No. 3:05-cv-00613 (M.D. Tenn. Aug. 8, 2005) (ECF No. 19) (*ex parte* TRO with asset freeze, appointment of receiver, and immediate

access); *FTC v. 4086465 Canada, Inc.*, Case No. 1:04-cv-01351-DAP (N.D. Ohio July 19, 2004) (ECF No. 13) (*ex parte* TRO with asset freeze and immediate access); *FTC v. Internet Mktg. Grp., Inc.*, Case No. 3:04-cv-00568 (M.D. Tenn. Jun. 29, 2004) (ECF No. 84) (*ex parte* TRO with asset freeze, appointment of receiver, and immediate access); *FTC v. Hanson Publ'ns, Inc.*, Case No. 1:02-cv-02205-DCN (N.D. Ohio Nov. 12, 2002) (ECF No. 11) (*ex parte* TRO with asset freeze and immediate access); *FTC v. 1st Beneficial Credit Servs. LLC*, Case No. 1:02-cv-01591-DCN (N.D. Ohio Aug. 14, 2002) (ECF No. 7) (*ex parte* TRO with asset freeze and immediate access); *FTC v. Jackson*, Case No. 3:01-cv-00170 (M.D. Tenn. Feb. 20, 2001) (ECF No. 13) (*ex parte* TRO with asset freeze, appointment of receiver, and immediate access); *FTC v. Laser Express of Tenn., Ltd.*, Case No. 3:99-cv-01135 (M.D. Tenn. Dec. 7, 1999) (ECF No. 10) (*ex parte* TRO with asset freeze, appointment of receiver, and immediate access).

20. For the reasons stated above, and as contemplated by Federal Rule of Civil Procedure 65(b), there is good cause to believe that immediate and irreparable harm will result, including the destruction of Defendants' records and the dissipation or concealment of assets necessary for consumer redress, if Defendants receive advance notice of the FTC's TRO Motion. Therefore, the FTC respectfully submits that it is in the interests of justice and the public that the *ex parte* TRO Motion be heard without notice to Defendants.

21. For the same reasons, there is good cause to believe that immediate and irreparable harm will result if any of the Defendants receives premature notice of the filing of this action. The FTC therefore submits that the interests of justice would also be served by temporarily sealing the entire case file and docket.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 11/7, 2022, in Atlanta, Georgia.

_/s/ Margaret Burgess_
MARGARET BURGESS
233 Peachtree Street, NE, Ste. 1000
Atlanta, GA 30303
Telephone: 202-250-4693
Email: mburgess1@ftc.gov

Attorney for Plaintiff Federal Trade Commission

18

Case 3:22-cv-00895   Document 6   Filed 11/07/22   Page 18 of 18 PageID #: 170