UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | Case No. 3:22-cv-00895 |
| v. | JUDGE RICHARDSON |
| ACRO SERVICES LLC, et.al, | |
| Defendants. | |

## RECEIVER'S FIRST REPORT

**COMES NOW**, S. Gregory Hays, the duly authorized and acting Receiver herein the "**Receiver**"), by and through counsel, and herewith makes and files this *First Report* with the Court and shows as follows:

### BACKGROUND

1. The Receiver was initially appointed as Receiver on November 21, 2022 pursuant to the *Temporary Restraining Order* (the "**TRO**") [ECF No. 26].

2. The Court continued the appointment of the Receiver in the Stipulated Preliminary Injunction Order (the "**Preliminary Injunction**") entered on December 13, 2022 [ECF No. 49].

3. As set forth in the TRO and Preliminary Injunction (the "**Receivership Orders**"), the Receiver was appointed as the Receiver for the Entity Defendants[1] herein. The Entity Defendants, as defined in the Receivership Orders are: ACRO Services LLC; American Consumer Rights Organization; First Call Processing LLC; Music City Ventures, Inc.; Nashville Tennessee Ventures, Inc.; Reliance Solutions, LLC; Thacker & Associates Int'l LLC; Consumer Protection Resources, LLC. As further defined therein, the term Entity Defendants includes each of their "subsidiaries, affiliates, successors and assigns."

4. In the Complaint filed by the FTC, the FTC alleges that the Defendants operated a scheme which falsely promised to eliminate or substantially reduce consumer credit card debt while charging consumers exorbitant fees for such services (the "Consumer Credit Business"). The Complaint further alleges that the Defendants did not provide the debt relief promised and did not offer legitimate debt relief services. The FTC alleged that as much as $20 Million was raised by the Defendants in this business and that as much as approximately $30 Million may have passed through the Entity Defendants' bank accounts.

5. Immediately upon learning of his appointment, the Receiver engaged professionals to assist him in discharging his duties in this case. He retained Hays Financial Consulting LLC, to provide financial consulting and other services and retained the Law Offices of Henry F. Sewell Jr., to serve as lead counsel. The Receiver and his counsel immediately reviewed the pleadings and documents filed by the FTC. The Receiver's immediate focus was on (i) securing the assets of the Entity Defendants for which he was appointed as Receiver; (ii) determining whether the

---

[1] The definition of Entity Defendants from Page 4 of the Preliminary Injunction Order is incorporated herein.

Consumer Credit Business was still in operation and (iii) coordinating with the FTC on the freezing of bank accounts. The Receiver was further advised that upon entry of the initial TRO Order that the FTC would send freeze letter to numerous banks and financial institutions at which the Defendants may have held bank accounts. The following is a summary of the Receiver's activities to date:

## SECURING OF LIGON ROAD PROPERTY

6. The information available to the Receiver indicated that the Consumer Credit Business was operated at 503 Ligon Drive, Nashville, Tennessee 37204 and that if the business were still in operation it would be at that premises. Accordingly, the Receiver dispatched Scott Askue of Hays Financial Consulting to that office immediately upon his appointment. Mr. Askue prepared a detailed report of his inspection and of the assets secured by him which is attached hereto as Exhibit "A".

7. The critical facts learned during this first inspection were as follows: (i) the Consumer Credit Business was not currently in operation at that location and had not been in operation for at least several months; (ii) various assets and business records of the Defendants were located 503 Ligon and were secured by the Receiver; (iii) a potentially related business --- Welken Insurance --- was no longer in operation at either 503 Ligon or 501 Ligon, an adjoining building; and (iv) two medical services businesses had entered into subleases with an entity owned by Defendants Thompson and Huffman and were using most of the premises for their respective business operations.

8. After Mr. Askue reported his initial findings to the Receiver, counsel for the Receiver reached out to the landlord and was ultimately put in touch with counsel for the landlord.

The Receiver determined that the owner of this property was individual named Jim Stafford. After consulting with the landlord and with the respective tenants, the Receiver was advised that the landlord had entered into a lease with Defendant Music City Ventures LLC on January 5, 2018 for the entirety of 503 Ligon Drive. This lease expires on January 30, 2023. The Receiver further learned that the Consumer Credit Business had been closed for several months and had not been in active operation at 503 Ligon since at least the Spring of 2022. The Receiver further discovered that each of the two subtenants had entered into a sublease with a non-defendant entity named Nashville Health & Wellness LLC ("NHW") which sublease was signed by Defendant Preston Thompson as "Owner". These subleases, which were for discrete sections of 503 Ligon, were also due to expire on January 30, 2023. The Receiver questioned counsel for Defendant Thompson as to whether any agreements existed between Music City Ventures and NHW and was advised that none existed.

9. After further discussions with the subtenants and the landlord, the Receiver concluded that the sub-tenants had no involvement in the Consumer Credit Business and were current on their rent obligations through November, 2022. The Receiver learned that the subtenants were not paying rent to NHW, but instead were making rent payments to an entity named PTSH LLC and that this same entity was paying the rent due to Mr. Stafford by Music City Ventures. The subtenants expressed a concern to the Receiver regarding potential harm to their businesses and uncertainty as to the payment of rent. Mr. Stafford similarly expressed concerns about the payment of rent due for the months of December and January, the use of a portion of the premises by the Receiver and for an orderly termination of the lease at the end of January. The Receiver ultimately entered into written agreements with the subtenants and Mr. Stafford pursuant

to which the subtenants will pay rent directly to Mr. Stafford and which will ensure that utilities, taxes, insurance and other related expenses are paid. Further, the agreements provide that the Receiver can continue to have access to the portions of the building sealed off by Mr. Askue during his initial inspection. Based on the amounts of the base rent and amounts paid by the subtenants and after crediting all security deposits, the Receiver expects to receive between $3,000 to $6,000 at the conclusion of these agreements in early February, 2023.

## BANK ACCOUNT INFORMATION

10. Upon entry of the TRO, the FTC served notice of the TRO and asset freeze upon numerous banks and financial institutions. These notices directed the financial institution to report to the Receiver as to the current status of any accounts held by the Defendants herein as well notify them of the asset freeze.

11. Attached hereto as Exhibit "B" is a spreadsheet prepared by the Receiver reporting the information obtained by the Receiver with respect to the Defendant's bank accounts. As set forth therein, the Entity Defendants have only approximately $1,000 in cash on hand and, indeed, most of the accounts are overdrawn and/or closed.

12. With respect to the individual Defendants, Defendant Thompson has $94,075 frozen at CapStar in a Savings Account which is now the subject of a separate motion filed by him; however it appears to be a joint account. Neither Defendant Huffman nor Defendant Austin have any significant available cash.

## INTERVIEWS OF THE INDIVIDUAL DEFENDANTS

13. After his appointment, the Receiver requested direct interviews of each of the individual defendants, Sean Austin, Preston Thompson and Scott Huffman.

14. Mr. Austin immediately made himself available for an interview and was generally cooperative and answered the Receiver's questions. Mr. Austin did not have counsel present and advised the Receiver that he could not afford counsel.

15. Initially, Messrs. Thompson and Huffman were represented by Greg Oakley, a local attorney. Mr. Oakley did not make either Mr. Thompson or Mr. Huffman available for interview until after the second TRO was entered; however, Messrs. Thompson and Huffman did subsequently make themselves available for an interview and have been generally cooperative with the Receiver and answered questions about the business operations and assets of the Entity Defendants.

## THE CONSUMER CREDIT BUSINESS

16. The voluminous documents and information filed by the FTC in support of its Complaint and the injunctive relief granted by the Court indicate that the Consumer Credit Business generated over $20 Million in revenues for a several year period and was an active business with numerous employees for several years. The Receiver was surprised and concerned to learn that the bank accounts of the Entity Defendants were depleted, that it appeared that the Consumer Credit Business had been closed for several months and had no employees and that the individual Defendants did not seem to have significant assets. Indeed, each of the individual Defendants reported that the Consumer Credit Business had essentially failed and complained to the Receiver that they were in personal financial distress.

17. Although the Receiver has not yet conducted an extensive funds tracing to determine the disposition of the funds received by the Defendants from consumers, the Receiver did interview each of the individual defendants about the operation of the business and conducted

an initial review of the bank account information available to him. The Receiver's initial concern was to gain an understanding as to what might have happened to the funds raised by the Defendants prior to conducting a further, and perhaps expensive, investigation. It should be noted that the impressions of the Receiver as set forth herein are based on this preliminary investigation and remain subject to complete investigation. The Receiver provides this information to the Court so that the Court is fully advised as to the status of the Receiver's work to date and not as a final report with final conclusions.

18. With respect to the revenues generated by the Consumer Credit Business, the Receiver has learned that the vast majority of the funds generated in that business were used to pay fees and commissions to sales agents, fees associated with credit card charges and fees to third parties to provide customer fulfillment services. Remaining funds were used to pay employees and other business expenses. The Receiver has not yet determined the amount of disbursements made to the individual Defendants herein. Further, the business operations were plagued by charge backs asserted by consumers who opted to receive their money back. The initial appearance to the Receiver is that the Consumer Credit Business, as operated by the Defendants, was not economically sustainable and had, in fact, failed by the Spring of 2022.

19. Based on the initial interviews and initial review of bank information, the Receiver has learned that the Defendants received referrals for potential consumer customers from several "Sales Rooms". These Sales Rooms, often off-shore entities, actually contacted potential consumer customers for the Defendants and then referred such customers to the Defendants. However, the cost of the referral was steep, at least 50% of the amount paid by the consumer to the Defendants.

20. For example, Defendant Music City Ventures entered into a "Sales Room Engagement Agreement" with an entity named Xperts Solution on July 13, 2021. This non-exclusive agreement provided that Xperts would be paid "Fifty Percent (50%) of all gross revenues generated … from clients referred to …" the Defendants. In exchange, Xperts would contact and pre-qualify consumer customers for referral to the Defendants.

21. Based on the information available to the Receiver to date, this 50% fee seems to be the standard referral fee and the Receiver has already identified several other "Sales Rooms" used by the Defendants and has seen large wire transfers to several of them. Whatever amounts were actually raised by the Defendants from consumers, half of such funds were almost immediately paid to one or more Sales Rooms.

22. Once a customer was referred to the Defendants, the Defendants would then contact the consumer customer in order to obtain and verify credit card information for payment. Here again, substantial fees were charged. First, the Defendants primarily used a firm named BlueSnap to process charges. In addition, Defendants Thompson and Huffman stated that their role in the Consumer Credit Business was to complete the credit card charges and they charged a service fee on these charges. Collectively, and although the amounts varied, BlueSnap and Thompson/Huffman would collectively charge over ten percent (10%) of the gross amount of each credit card charge as a fee.

23. It does appear to the Receiver that for every dollar received from a consumer, at least 60 -70 cents was paid out in commissions and fees prior to any alleged fulfillment services actually being provided or other business expenses paid.

24. The remaining funds were then used to provide alleged "customer fulfillment services". At this point of the investigation, the Receiver is still attempting to determine the precise nature of the services which the individual Defendants believed were allegedly to be provided to consumers. The Receiver has not obtained a clear answer on this critical issue and will therefore not further comment at this time. However, the funds remaining after the payment of the Sales Rooms and credit charge processing fees, were used to pay employees and other third parties to provide these alleged fulfillment services. Defendant Sean Austin appears to have been primarily responsible for this part of the business operation. It does appear that a substantial amount was paid to an entity named Lawco located in Locust Grove, Georgia to provide fulfillment services, although the Receiver cannot currently estimate the total payments made.

25. As set forth in the FTC's Complaint and supporting documents, many consumers were dissatisfied with the services provided by the Defendants. Many of these consumers issued charge backs of the amounts paid through their credit card companies. Based on interviews with the individual Defendants, these charge backs wrought havoc on the operation and cash flows of the Consumer Credit Business. According to Sean Austin, the business was simply unable to pay employees and third parties to provide services to the consumers and revenues began to fall as customers complained and charge backs were issued. This resulted in the closing of the business in the Spring of 2022. The Receiver is satisfied, based on the information available to him, that the Consumer Credit Business has indeed ceased and that the Defendants are not currently engaged in the activities complained of in the FTC' Complaint and Motions.

## OTHER BUSINESSES AND PTSH LLC

26. In conducting due diligence in the matter, the Receiver researched the extent to which the individual Defendants were involved in other --- and possibly related --- businesses. Of particular concern to the Receiver was to identify possible subsidiaries, affiliates, successors, and assigns of the Entity Defendants which would be included within the Receivership. In addition, several parties who had dealings with Defendants Thompson and Huffman in particular described them as "serial entrepreneurs" and the Receiver viewed these entities as possible recipients of monies from the Entity Defendants or the Consumer Credit Business. Indeed, After the failure of the Consumer Credit Business, Defendants Thompson and Huffman attempted to launch another business venture.

27. Attached hereto as Exhibit "C" is a list of active and inactive entities derived from public records searches which may have some relationship with either the individual Defendants or the Entity Defendants.

28. One of the entities apparently formed by Defendants Thompson and Huffman is PTSH LLC which is a Tennessee LLC. The Receiver is informed that this entity is owned by Defendants Thompson and Huffman. It is not named as a Defendant herein, but, as an affiliate of Music City Ventures, also owned by Thompson and Huffman, the Receiver believes that its assets have been frozen and are subject to the Receivership established by this Court and has so advised Defendants Thompson and Huffman and Mr. Oakley.

29. PTSH currently owns four properties located in the State of Florida and a lot located in Tennessee. These assets are summarized in Exhibit D. Three of the properties in Florida are commercial real estate buildings and the fourth is a home occupied by a business associate of

Messrs. Thompson and Huffman. These properties were acquired by PTSH for the purpose of pursuing a medical rehabilitation service business which does not appear to have actually generated revenues for PTSH, although equity may exist in the real estate. The Receiver is advised that no rent is being paid on any of these properties to the Defendants or to PTSH. Loans were taken out by PTSH to acquire these properties and are secured by those properties. The Receiver's understanding is that the obligation to pay the mortgages on these properties is PTSH's and that due to certain business arrangements which have not been verified by the Receiver, the current occupants of the PTSH properties have no obligation to pay rent or mortgage payments. It does appear, although the Receiver has not confirmed, that proceeds of the Consumer Credit Business may have been used to acquire this real estate.

30. The Receiver intends to further investigate and discuss this entity with Messrs. Thompson and Huffman and their counsel and reserves the right to seek to expand the Receivership to expressly include this entity.

## OTHER BUSINESS ACTIVITIES OF THE INDIVIDUAL DEFENANTS

31. To the best of the current information available to the Receiver, Messrs. Thompson and Huffman have not earned any substantial income since the failure of the Consumer Credit Business and appear to have been living off of savings and home equity lines. Their attempts to start new businesses also appear to have failed. The Receiver believes and is informed that they are not currently employed.

32. Messrs. Thompson and Huffman do collectively lease four vehicles through Music City Ventures. A list of the vehicles is as follows:

11
Case 3:22-cv-00895   Document 61   Filed 01/09/23   Page 11 of 16 PageID #: 1976

| **Driver** | **Vehicle** |
|---|---|
| Huffman | 2021 Mercedes-Benz GLE 55 |
| Huffman | 2022 Chevrolet Silverado |
| Thompson | 2022 Dodge Ram 1500 |
| Thompson | 2021 Cadillac Escalade AWD |

33.     The Receiver has advised each of them that he will not consent to use of the funds which are currently frozen to fund lease payments and has requested confirmation of insurance for these vehicles. The Receiver does not believe that there is any equity in these assets.

34.     Since the failure of the Consumer Credit Business, Mr. Austin has lived off what appears to be a pension related to his service in the United States Navy and worked as an Uber driver. He has recently obtained permanent employment.

## FROZEN ASSETS

35.     In addition to the Bank Accounts and the assets of PTSH, the Receiver has prepared a list of assets frozen both with respect to the Entity Defendants and the individual Defendants. These assets are listed in Exhibit D.

36.     First, with respect to the Entity Defendants, the Entity Defendants have approximately only $40,000 in assets based on the value of two off-road vehicles (Polaris ATV's) which are titled in the name of Music City Ventures.

37.     With respect to the individual Defendants, they have virtually no liquid assets (with the exception of Defendant Thompson's Capstar account). However, each of the individual

defendants have substantial equity in their homes. The Receiver has estimated the collective value of the individual Defendants' assets, subject to the asset freeze and net of mortgages, is $1,493,682, of which $1,294,225 consists of potential value in their personal residences. Further, the Court and the Parties should be advised of the following: (i) the values ascribed to the real estate are not based on formal appraisals or broker opinions; (ii) the real estate is jointly held by the spouses of the individual defendants and those spouses may have rights to at least one half of the value of such real estate and (iii) the individual Defendants may have rights to homestead protections under Tennessee law. Outside of the equity in their homes, the individual Defendants have limited assets.

38. With respect to PTSH, the Receiver has further investigated the potential value of the assets in that entity which, because PTSH is an affiliate of Music City Ventures, are frozen by virtue of the Receiver Orders. Again, subject to the caveat that the values are based on Zillow, these properties appear to have collective equity of $668,619. The Receiver has not yet finished his investigation of this entity; however, these properties all appear to be titled in the name of PTSH giving it the right to liquidate the properties. The Receiver is currently investigating whether to seek to formally add this entity to the Receivership.

39. With respect to Defendant Thacker & Associates Int'l LLC, the Receiver has been advised that this entity was sold several years ago and is now owned by individuals otherwise unrelated to these Defendants or the Consumer Credit Business. The Receiver is still investigating the current status of this entity and if it is determined that this entity was sold, the Receiver will move to have it removed from the Receivership.

## RECEIVER'S CURRENT ACTIVITIES

40. The Receiver is currently assessing the potential value of the assets of the Receivership and is in consultation with the Plaintiff FTC regarding future work and investigations to be undertaken by the Receiver and the Receiver anticipates making a recommendation in the near future.

41. Of particular concern to the Receiver are the following issues:

    a. The status of PTSH and its assets and whether such assets can be recovered for consumers herein;

    b. Confirmation of the existence and status of all bank accounts used by the Defendants;

    c. The potential cost and expense of a complete forensic investigation weighed against the benefit of such an examination;

    d. Whether claims can be asserted against the Sales Rooms and whether any recovery can be had on same;

    e. The fact that there appear to be very limited assets available for recovery for consumers in this case, outside of equity in the homes of the individual Defendants and their respective spouses.

42. The Receiver is prepared to answer any questions the Court may have regarding this Report.

Respectfully submitted this 9th day of January, 2023.

                      MANIER & HEROD, P.C.

                      /s/ Michael E. Collins
                      Michael E. Collins (Tenn. Bar No. 16036)
                      1201 Demonbreun Street, Suite 900
                      Nashville, TN 37203
                      615-244-0030
                      mcollins@manierherod.com

                      LAW OFFICES OF HENRY F. SEWELL JR., LLC

                      ***/s/ Henry F. Sewell, Jr.***
                      Henry F. Sewell, Jr.
                      Georgia Bar No. 636265
                      *Admitted Pro Hac Vice*

                      Buckhead Centre
                      2964 Peachtree Road NW, Suite 555
                      Atlanta, GA 30305
                      (404) 926-0053
                      hsewell@sewellfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2023 a true and correct copy of the foregoing was served through the Court's electronic filing system on the following:

MARGARET BURGESS
ALAN BAKOWSKI
NATALYA RICE
Federal Trade Commission
233 Peachtree Street, NE, Ste. 1000
Atlanta, GA 30303
Telephone: 202-250-4693 (Burgess)
Telephone: 404-656-1363 (Bakowski)
Telephone: 202-445-8587 (Rice)
Email: mburgess1@ftc.gov,
abakowski@ftc.gov, nrice@ftc.gov

AND

GREGORY H. OAKLEY
BUILDLAW, PLC
4300 Sidco Dr., Suite 200
Nashville, TN 37204
greg@build.law

                                               /s/ Michael E. Collins
                                               Michael E. Collins