UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| Plaintiff, | ) |
| v. | ) No. 3:22-cv-00895 |
| | ) JUDGE RICHARDSON |
| ACRO SERVICES LLC, et al., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant John Preston Thompson's motion to amend the asset-freeze provisions (Doc. No. 53, "Defendant's motion") of the current preliminary injunction (Doc. No. 49). The Federal Trade Commission ("FTC" or "Plaintiff") filed a response. (Doc. No. 60). Receiver S. Gregory Hays, through counsel for the FTC, also filed a response. (Doc. No. 62). For the reasons stated herein, Defendant's motion is GRANTED in part and DENIED in part.

BACKGROUND

Plaintiff Federal Trade Commission ("FTC" or "Plaintiff") filed its Complaint for Permanent Injunction, Monetary Relief, and Other Relief pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b) and 57b, and Section 6(b) of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6105(b), on November 7, 2022, and moved, pursuant to Fed. R. Civ. P. 65(b), for a temporary restraining order, asset freeze, appointment of a temporary receiver, other equitable relief, and an order to show cause why a preliminary injunction should not issue against Defendants. On November 21, 2022, the Court issued an order granting in part the FTC's motion for temporary

restraining order and order to show cause why a preliminary injunction should not be issued pursuant to Rule 65 of the Federal Rules of Civil Procedure (the "TRO"). (Doc. Nos. 26 and 27). On December 13, 2022, the FTC and Defendants Sean Austin, John Steven, and John Preston Thompson (collectively, "Defendants") requested the Court enter a Stipulated Preliminary Injunction. (Doc. No. 47).

The Court entered the Stipulated Preliminary Injunction ("Injunction") as to all three Defendants. (Doc. No. 49). In the Injunction, Defendant agreed that he owned and controlled Music City Ventures Inc. ("MCV") and Nashville Tennessee Ventures, Inc. ("NTV") and Thacker & Associates Int'l LLC with Defendant John Steven Huffman. (*Id.* at 1). Defendant further agreed that "Plaintiff has demonstrated that Defendants likely have violated and will likely continue to violate Section 5 of the FTC Act and the TSR, and that Plaintiff is therefore likely to succeed on the merits, provided however, that these findings are not admissions by Defendants and are not intended to preclude them from disputing such findings in subsequent proceedings." (*Id.* at 2). The Injunction further states that the Injunction "is in the public interest" and that "good cause" supports the continuation of the "asset freeze." (*Id.*). Although the Injunction contains several provisions freezing the assets of Defendants, it includes several exemptions to the asset-freeze provisions:

1. "As already provided for under the TRO (Doc. 26), each Individual Defendant shall be permitted to withdraw up to $2,000 from each bank account held by that Individual Defendant while this Order is in place. That is, up to $2,000 per bank account held by each Individual Defendant is exempted from the asset freeze originally established by the TRO and as continued by this Order.

2. As already provided for under the Order continuing the TRO (Doc. 41), Sean Austin shall be permitted to withdraw up to $3,000 from the Wilson & Trust Bank account ending in 0021 (in addition to the previously permitted $2,000 withdrawal under the TRO) to cover personal living expenses.

3. As already provided for under the Order continuing the TRO (Doc. 41), John Steven Huffman shall be permitted to withdraw up to $3,000 from the CapStar account ending in 3110 (in addition to the previously permitted $2,000 withdrawal under the TRO, Doc. 26) to cover personal living expenses.

4. As already provided for under the Order continuing the TRO (Docs. 41 and 43), John Preston Thompson shall be permitted to withdraw up to $3,000 from the CapStar account ending in 8952 (in addition to the previously permitted $2,000 withdrawal under the TRO, Doc. 26) to cover personal living expenses."

(Doc. No. 49 at 7–8). The Injunction further states: "The Individual Defendants may request from Plaintiff's counsel—and the Receiver, in the event the request concerns receivership Assets—in writing and with supporting documentation, a stipulation agreeing to the release of frozen funds for reasonable and necessary expenses, including reasonable amounts to pay for the services of counsel." (*Id.* at 8). In the event that the parties are unable to agree on the release of frozen funds, the Injunction order permits the Court to resolve such disputes. (*Id.*).

Defendant jointly owned Music City Ventures, Inc. and First Call Processing, LLC with Defendant Steve Huffman. (Doc. No. 63-1 at 1 (Thomas Decl.))[1]. Defendant alleges that neither

---

[1] For the purposes of resolving the pending motion, the Court treats as true statements in Defendant's declaration that are uncontradicted by the stipulations in the Injunction and not otherwise expressly disputed by any party. The Court notes that Defendant filed two declarations, the latter of which is intended to replace the former (Doc. Nos. 54-1 at 1–5, 63-1). The two declarations are identical except that (i) they bear respective dates four days apart from one another, and (ii) the former is unsigned, and the latter is signed by Defendant.

company has conducted business in several months and neither he nor his wife now have a regular source of income and have been doing odd jobs since the asset freeze was instated. (*Id.*). Defendant therefore requests, in addition to the $2,000 per bank account held by Defendant and the $3,000 withdrawal from the CapStar account, the following unfreezing of assets:

    1) Permission for him to withdraw $20,000 from a CapStar account ending in 9927 (the "Savings Account") on a monthly basis (*Id.* at 2)[2]

    2) Permission for him to withdraw $25,000 from the Savings Account for the purposes of a retainer for counsel (*Id.* at 2, 6)

    3) Permission to access a line of credit (secured by his home) at CapStar with a balance of $250,051.41 (*Id.*)

    4) Permission to sell two utility terrain vehicles ("ATVs") owned by Music City Ventures Inc. (*Id.* at 5).[3]

The FTC and the Receiver, through counsel for the FTC, filed responses. (Doc. Nos. 60, 62).

## DISCUSSION

As noted above, Defendant requests that the Court unfreeze several of his assets. Namely, he requests his assets be unfrozen to fund a retainer for his attorney and to allow him to pay for his living expenses. As to his request to unfreeze assets to pay for his attorney, the FTC does not

---

[2] The FTC notes that Defendant's reference to the CapStar account ending in 9927 is a typographical error. (Doc. No. 60 at 4, n. 4). According to the FTC, that account has a balance of $1,065.97. (*Id.*). The correct account is likely the CapStar account ending in 8952, as identified in the Injunction, which has a balance of $90,074.17. (Doc. No. 49 at 7–8).

[3] The Court notes Defendant is not entirely clear on whether he requests a one-time withdrawal of $20,000 or a monthly withdrawal. However, given Defendant's reference to his monthly expenses exceeding $30,000 and his request for the "Court to unfreeze the cash in the Savings Account," the Court is content that it has provided a fair reading of Defendant's motion. (Doc. No. 54 at 4, 7). The Court also notes that it often (as here) is beneficial to a movant for a court to provide a broader construction of the movant's requested relief where ambiguity exists in this regard; by so doing, the court can avoid providing less relief than it otherwise would had it only known the movant wanted more relief.

oppose this request but asks the Court to unfreeze the funds from Defendant's line of credit rather than from the Savings Account. As discussed directly below, the Court agrees that permitting Defendant to access his line of credit to fund a retainer for his counsel is proper. Further, the Court will permit $2,500 to be unfrozen from the Savings Account to be used for Defendant's living expenses. As to the remainder of Defendant's requests, his motion is denied.

1. **<u>Unfreezing of Assets for Attorney Retainer</u>**

Defendant requests that the Court unfreeze his Savings Account to allow him to pay $25,000 as a retainer for counsel. (Doc. No. 54 at 2). The Injunction permits an individual defendant (as compared to an entity defendant) to request the release of frozen funds for "reasonable and necessary expenses, including reasonable amounts to pay for services of counsel." (Doc. No. 49 at 8). To the extent the parties agree on the request, the Court may modify the asset freeze via court order. (*Id.*). If Plaintiff objects to the request, however, the Court may resolve the dispute. (*Id.*). Given that an individual defendant's request must be for only those funds that are for "reasonable and necessary expenses," the Court finds it fitting to apply that standard to its determination of whether the Defendant's request to unfreeze several assets, in whole or in part, is warranted. Therefore, in addition to other requirements discussed below, Defendant must show that his requests for funds are reasonable and necessary.

The FTC does not oppose unfreezing Defendant's line of credit at CapStar Bank for the limited purpose of paying $25,000 as a retainer for counsel in connection with this action. (Doc. No. 60 at 2). Though the parties disagree about the source from which Defendant should access the funds (Savings Account versus line of credit), evidently the parties do not dispute that he should be able to access the funds to retain counsel. The Court agrees with the FTC that accessing the funds through the line of credit at CapStar bank is less likely to impair the FTC's ability to collect a judgment for purposes of consumer redress should the case reach that stage. (Doc. No. 60 at 11–

12). Therefore, the Court will permit Defendant to access $25,000 through his line of credit at CapStar bank for the purposes of accessing a retainer for counsel.

2. **Unfreezing of Assets for Living Expenses**

Defendant requests that the Court unfreeze, at least to some extent, several assets to enable payment of living expenses.[4] Specifically, he requests that the Court unfreeze: 1) the Savings Account to permit Defendant to withdraw $20,000 per month, 2) the line of credit at CapStar Bank with a balance of $250,051.41,[5] and 3) two ATVs currently held in the receivership in order to allow Defendant to sell the vehicles and use the funds. The FTC asks the Court to deny in full Defendant's request for the Court to unfreeze assets to be used for living expenses. (Doc. No. 60 at 2).

   a. Unfreezing Savings Account

Defendant states that his monthly expenses to support his family are currently $33,515.23 per month, and that the absolute minimum to which he can narrow the amount to is $19,796.24 per month to cover his expenses as illustrated in Exhibit D to Defendant's motion. (Doc. No. 63-1 at 3; 54-1 at 7, 33). Defendant states that he has not been able to use his credit cards to make car or utility payments. (Doc. No. 63-1 at 3). He also states that he has several minimum monthly payments to be made on the line of credit and credit cards. (*Id.* 2–3). According to Defendant, he does not currently have a regular source of income since the implementation of the asset freeze—

---

[4] In general, the Court herein uses "living expenses" to refer to all expenses other than expenses for retention of counsel.

[5] The Court assumes that the reference here is to the balance *due* on the line of credit. Defendant explains that the line of credit is in the amount of $599,948.59. (Doc. No. 63-1 at 2). So the amount of funds available on this line of credit is nearly $350,000. It does not help Defendant that he does not state how much of this $350,000 he wishes to access, and how often (if more than once) he wishes to access it. For all the Court can tell, he is making the huge request for the full nearly $350,000.

and as for his wife, she recently reactivated her real estate license but is not yet earning income. (*Id.* at 1).

      i.    *Reasonable and Necessary*

As noted, Defendant must show that his request to release frozen funds is for "reasonable and necessary expenses." (Doc. No. 49 at 8). Even if Defendant makes this showing, however, it is within the discretion of the district court to decide whether to unfreeze assets currently frozen by the preliminary injunction. *See e.g.*, *FTC v. IAB Marketing Associates, LP*, 2013 WL 2433214, at *2 (S.D. Fla. June 4, 2013) ("[A] court has discretion to refuse to unfreeze assets so that a defendant can use those assets to pay for living expenses or attorney fees."); *FTC v. Federal Check Processing, Inc.*, 2016 WL 10988581, at *1 (W.D.N.Y. Mar. 7, 2016) ("Just as this Court has the authority to freeze assets in a civil enforcement action, it also has the discretion to unfreeze those assets when equity requires.") (internal quotation marks and citation omitted).

The FTC contends that Defendant has not shown the assets he requests to be unfrozen are reasonable and necessary. While the FTC does not go so far as to parse what it deems as unnecessary versus what it deems as unreasonable (assuming not all requests are both), it does point out that the list of monthly expenses in Exhibit D that Defendant states are reflective of those allegedly necessary to cover his current living expenses include a student loan, leases for two vehicles, and car insurance for two vehicles. (Doc. No. 60 at 5–6 (citing 54-1 at 33)). Defendant specified in his reply that the car lease payments and accompanying insurance constitute $3,884.92 per month. (Doc. No. 64-1 at 6). The FTC also points out that many of the expenses on Defendant's list reflect loans or credit cards taken out by Defendant that have either now come due or are continuing to accrue interest. (Doc. No. 60 at 5–6 (citing 54-1 at 33)). The Court does not view these expenses (*i.e.*, the loans, credit cards, and expenses related to Defendant's vehicles) as

necessary or reasonable. It seems a major stretch to describe as "necessary" two cars that cost almost $4,000 per month to maintain. Even if (multiple) cars were considered a necessity, the amount Defendant requests for his cars is unreasonable. Further, though the Court is sympathetic to Defendant's desire to make payments on his various loans, including credit cards, the Court does not view these as necessary expenses. And again, given the multitude of credit cards and loans held by Defendant, the sum of funds he would need to assist in payment of the loans would be unreasonable.

Defendant also requests funds for his mortgages, utilities, and food, explaining that his mortgages constitute $6,955.52 of his expenses per month (although it appears that the amount of principal and interest is actually $602.33 less than that, since Docket Number 54-1 at 31 reflects that $602.33 is escrowed for taxes and interest), his utilities constitute $2,161.18 per month, and his food for his family is $1,625 per month (Doc. Nos. 64-1 at 6, 54-1 at 33)). Defendant's request for expenses for things such as his mortgage, food, and utilities strike the Court as reasonable in their amounts—indeed, these totals reflect food and shelter for a family of four. The FTC makes the point that Defendant chose to live in an expensive house with such high mortgage payments, but Defendant's mortgage payments (though surely very large by most, though by no means all, Americans' standards) do not appear outrageous to the Court.

Further, courts have found that failure to show an effort to obtain gainful employment to cover living expenses generally weighs against unfreezing of assets. *See FTC v. Telestar Consulting, Inc.*, 2017 WL 11632797, at *5 (C.D. Cal. March 22, 2017) ("Perhaps the most problematic aspect of Defendant's request [to unfreeze assets] is his failure to make any showing either that his wife or his daughters have made efforts to obtain gainful employment sufficient to cover their expenses or that these individuals are incapable of working."). Indeed, unfreezing

assets becomes significantly less necessary where a defendant can earn a living. The FTC argues that Defendant has not attempted to find alternative employment to cover his living expenses, instead doing odd jobs. (Doc. No. 60 at 6).

In his reply, Defendant establishes that he and his wife have been actively seeking gainful employment. (Doc. No. 64-1). For example, Defendant explains in detail the jobs for which he has applied and the various efforts he has made in the interim to earn money. (Doc. No. 64-2 at 1–2). He further explains that his wife is working part-time at their church and is trying to establish a presence in real estate but has not yet earned income from this. (*Id.* at 2). The Court acknowledges these attempts to seek employment and finds that they weigh in favor of Defendant's request.

> ii. *Whether the Assets Contained in the Savings Account Are Tainted and the Need to Preserve Funds to Satisfy a Potential Judgment*

The Court's analysis does not stop with whether Defendant's request to unfreeze assets is reasonable and necessary. "To persuade a court to unfreeze assets, the defendant must establish that the funds he seeks to release are untainted and that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial."[6] *SEC*

---

[6] Defendant disputes whether the FTC can pursue disgorgement under Section 13(b) or Section 19 of the FTC Act. The Court agrees that it is unlikely that the FTC will be able to do so. The Court in *AMG Capital Management, LLC v. FTC*, 141 S. Ct. 1341 (2021) held that monetary remedies are not available under Section 13(b) (15 U.S.C. § 53(b)). Courts have similarly found that disgorgement is not available under Section 19, 15 U.S.C. § 57b. *See FTC v. Figgie Intern., Inc.*, 994 F.2d 595, 607 (9th Cir. 1993) (explaining that Section 19(b) allows for consumer redress, which is distinct from disgorgement). While the Court agrees with Defendant that it is likely that Section 19 does not permit the FTC to pursue disgorgement, it is sufficient at this juncture to find that, at a minimum, Section 19 permits the FTC to pursue "restitution on behalf of consumers, which authorizes the court to order 'such relief as the court finds necessary to redress injury to consumers,' including monetary damages, provided the FTC follows certain procedures." *See FTC v. Hanley*, 2022 WL 187848, at *1 (9th Cir. Jan. 20, 2022) (quoting 15 U.S.C. § 57b(b)). Therefore, although *Stein* was concerned with preserving an asset pool to ensure funds were available to satisfy a potential judgment (in favor of the SEC) ordering disgorgement, the Court is content that the principle of taking care to preserve assets to satisfy judgment applies with equal force to a potential judgment (in favor of the FTC) for consumer redress. True, on the one hand, disgorgement has a "punitive" purpose, borne out through depriving "the defendants of their profits[,]" *Kokesh v. S.E.C.*, 581 U.S. 455 (2017), whereas

*v. Bravata*, 763 F. Supp. 2d 891, 920 (E.D. Mich. 2011) (quoting *SEC v. Stein*, 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009)) (same); *FTC v. Image Sales & Consultants*, 1997 U.S. Dist. LEXIS 18905, at *7 (D. Ind. Nov. 14, 1997) ("[T]he Court also has a responsibility to keep some assets available for potential consumer redress in the event that the FTC prevails."). As noted above, the ultimate decision to unfreeze assets resides in the Court's discretion.

The FTC and the Receiver take serious issue with the source of the funds contained in the Savings Account. (Doc. No. 60 at 9; Doc. No. 62 at 3–4). As noted, when a defendant requests the court to unfreeze assets, he must show that the assets are untainted, meaning that they, at a minimum, do not stem from the illegal conduct of which he or the associated entity have been accused. *See Stein*, 2009 WL 1181061, at *1. The FTC also argues that the unfreezing of assets in this case is unwarranted because the total value of the asset freeze falls far below the amount likely needed to redress victims' injuries. (*Id.* at 2). Indeed, as the FTC points out (and the Court agrees), Defendant's requests would seriously deplete the pool of assets available to redress potential injury. For example, if Defendant were permitted to withdraw $20,000 per month from the Savings Account, the balance of the Savings Account would be depleted within six months.

---

redress serves to compensate victims, *see FTC v. Zurixx, LLC*, 2021 WL 5179139, at *13 (D. Utah Nov. 8, 2021). However, this distinction, arguably has no bearing on whether the asset pool ought to be preserved, and to the extent that the distinction does have a bearing, it cuts against Defendant; if anything, given policy interests favoring assistance to victims of wrongdoing, the imperative to preserve the possibility of *redress for consumer victims* via preservation of an asset pool is, if anything, more compelling that the imperative to preserve the possibility of *disgorgement of ill-gotten gains from wrongdoers via preservation of an asset pool*. Therefore, the Court is satisfied that preservation of the asset pool through the asset freeze remains an important consideration in the resolution of this motion even in the likely event that *disgorgement* in particular (as opposed to other kinds of equitable monetary relief that may be available at least under Section 19) is unavailable to the FTC in this action.

And as noted, courts are unlikely to unfreeze assets in cases in which so doing creates a risk of insufficient funds available to satisfy a judgment.[7] *See Stein*, 2009 WL 1181061, at *1.[8]

Defendant attempts to establish that the funds in the Savings Account are untainted by the alleged scheme. Defendant explains that the Savings Account was opened in May 2021. (Doc. No. 64-2 at 4). The Savings Account was funded by a check written for $200,000 dated May 21, 2021 from a joint Regions Bank checking account shared by Defendant and his wife. (Doc. No. 64-2 at 4, 15). The $200,000 in the Regions Bank checking account had come into that account via transfer from a joint Regions Bank savings account (also shared by Defendant and his wife). (*Id.* at 4). In other words, the $200,000 that ultimately funded the Savings Account had previously passed from the Regions Bank savings account to the Regions Bank checking account.

But despite the direction in which that particular $200,000 passed between the two Regions Bank accounts, Defendant explains that generally funds went between the Regions Bank accounts in the other direction, *i.e.*, from the checking account to the savings account. (*Id.* at 5). The Regions Bank checking account (which, as just noted, primarily funded the Regions Bank savings account),

---

[7] The Court acknowledges that its concern for preserving funds for potential victims may ring hollow given the likelihood that there are woefully insufficient funds with which to satisfy a potential judgment regardless of whether the Court allows certain assets to be unfrozen. However, the existing risk that there may be insufficient funds to satisfy a potential judgment counsels against the Court unfreezing assets in a material amount and thereby fostering an even greater risk of insufficient funds to satisfy a judgment.

[8] Defendant also argues that the Court should permit him to withdraw funds from the Savings Account because it is an account held jointly by him and his wife, and that under Tenn. Code. Ann. § 45-2-703(a), his wife would be permitted to commence an action against the FTC should the FTC seek to satisfy a judgment with funds contained in the joint account. (*Id.* at 8–9). Even if Defendant's wife could bring an action against the FTC for control of the funds in the joint account, it remains unclear how this in any way relates to the FTC's ability to access the funds in the first instance under the state statute. Tenn. Code Ann. § 45-2-703(a) plainly permits a creditor (which would include a judgment creditor) to access to funds in a joint account held by spouses. *See* Tenn. Code Ann. § 45-2-703(a) ("Any balance so created, *including, but not limited to, any balance held by spouses*, shall be subject to assignment by, or the claim of any creditor of, either depositor, as if the depositor were the sole owner of the funds…") (emphasis added). Thus, the Court is not persuaded by Defendant's reliance on § 45-2-703(a).

received Defendant's paychecks from NTV, and later, from MCV. (*Id.* at 5). As evidence of this set-up between the Regions Bank accounts, Defendant provides a November 2018 statement for the Regions Bank savings account, displaying a balance of $52,497.68. (Doc. No. 64-2 at 16). The statement shows a series of deposits totaling $2,500 made from the Regions Bank checking account to the Regions Bank savings account.

The FTC's complaint alleges that the unlawful scheme has been ongoing since at least 2019. (Doc. No. 1 at 3). The Savings Account was not established until 2021, approximately one to two years after the FTC alleges the unlawful scheme began. Therefore, by the time Defendant wrote the check for $200,000 in May 21, 2021 to fund the Savings Account, he was drawing on at least one year of NTV payments in the Regions Bank savings account that could be implicated in the unlawful scheme.

However, it is possible that NTV could have been generating revenue prior to 2019 that was untainted by the unlawful scheme, and that these funds remained in existence and were transferred to the Savings Account when Defendant used the $200,000 check to fund the Savings Account. Indeed, under the FTC's timeline, the Court has reason to believe that the $2,500 deposited from the Regions Bank checking account into the Regions Bank savings account in 2018, allegedly from NTV, were untainted by the scheme. It is certainly plausible (though admittedly not certain) that this $2,500 remained in the Regions Bank savings account until May 2021, when the funds were transferred to the Regions Bank checking account, and were eventually included in the $200,000 that were deposited into the Savings Account.[9]

---

[9] To the extent that Defendant argues that the funds in the Savings Account are untainted because they stem from NTV, the Court finds this argument unpersuasive. (Doc. No. 64-2 at 4). Defendant's position that NTV's revenue is unrelated to the alleged unlawful activity in this case is directly contrary to the parties' stipulated preliminary injunction, which states that "Plaintiff has demonstrated that Defendants [which include NTV] have likely violated and will likely to continue to violate" the FTC and TSR . . . ." (Doc. No. 49 at 2).

Given that Defendant has provided evidence to satisfy the Court that this $2,500 well may be untainted and that unfreezing this amount will not materially deplete the pool of assets available to victims in the event of a judgment in this case, the Court is content to unfreeze $2,500 from the Savings Account for Defendant to use for reasonable and necessary living expenses. However, because Defendant has not shown that remaining balance of the Savings Account is untainted, and given the Court's concern with preserving funds for a possible judgment, the funds contained in the Savings Account shall remain frozen. Defendant's request for a monthly withdrawal of $20,000 from the Savings Account is therefore denied, apart from a one-time withdrawal of $2,500.

The Court notes that it does not make this decision lightly. However, the Court's decision is consistent with courts faced with similar circumstances. For example, in *FTC. v. IAB Marketing Associates, LP*, Defendants sought to lift an asset freeze to pay living expenses after the court entered a preliminary injunction. 972 F. Supp. 2d 1307 (S.D. Fla. 2013). The preliminary injunction found that there was good cause to believe that the defendants "ha[d] engaged in and [were] likely to engage in acts or practices that violate[d]" the FTC Act. *See id.* at 1310. The court acknowledged that the defendants need "some money for necessities" but that "nothing in the Preliminary Injunction prevents them from working to support themselves." *See id.* at 1314. The court noted that the defendants' liability "dwarfs the frozen assets' value," weighing against the unfreezing of assets. *See id.*

The same is true here. The Court acknowledges that Defendant and his wife have been trying to find gainful employment. And the Court is aware that the asset freeze is imposing personal hardships on Defendant and his family. But the Court does not write on a clean slate. The slate, instead, includes statements in the Injunction (to which Defendant agreed) establishing a likelihood (though admittedly not a certainty) that Defendant will be held liable for violating at

least the TSR, which in turn portends the possibility of a substantial money judgment against him for equitable monetary relief for consumer redress. The slate also includes decades of case law indicating that the Court should be rather on the aggressive side in freezing assets to preserve the possibility of consumer relief—and that where the record reveals that an award of such relief is likely, the court should not unfreeze assets (to the potential disadvantage of consumer victims) based on sympathy to the defendant or the fact that liability is not certain.

The unfortunate reality of asset freezes is that they preserve legal interests sometimes at the "unpleasant consequence for the defendant . . . ." *See id.* at 1315. But the apparent impetus behind imposing such unpleasant consequences here actually is based on a desire to avoid and mitigate unpleasant consequences—for consumers. That is, the rationale for imposing such unpleasant consequences is a desire to avoid seeing them—seeing them visited *upon consumers*. The idea is that the defendant has been preliminarily shown to have likely engaged in illegal conduct that resulted in unpleasant consequences for consumers, and a freeze of the defendant's assets is necessary to prevent the possibility of additional illegal conduct and to provide funds for redress of the consequence of such illegal conduct. And the law is clear that the Court should vindicate these objectives at this juncture, based on the Injunction, without waiting on the grounds that Defendant ultimately could prove not liable.

The Court also believes that it is uncontroversial to state that Defendant and/or his wife stands a very good chance of securing gainful (if not necessarily preferred) employment, at far above, for example, minimum wage. Wages from such employment could be used to pay living expenses.

b. Unfreezing Line of Credit

Defendant requests that the Court unfreeze his line of credit at CapStar bank with a balance of $250,051.41 for living expenses. (Doc. No. 54 at 5, 7). He argues that he should be allowed to use his line of credit because the FTC would not be able to satisfy (even in part) a potential judgment using funds from a line of credit. (*Id.* at 8). Defendant argues that although the line of credit is secured by Defendant's home, the FTC would be precluded from satisfying a judgment (in part) by foreclosing a judgment lien on the home because Defendant and his wife own the home as tenants by the entirety. (Doc. No. 64-1 at 9). In support of his argument, Defendant cites *McKinney v. Kimery*, 2006 WL 2787000 (Tenn. Ct. App. Sept. 28, 2006). But under *McKinney* (an intermediate appellate court decision, which the Court will assume arguendo accurately reflects Tennessee law, as suggested by Defendant) judgment creditors are not necessarily prevented from ever reaching assets held by tenants by the entirety; indeed, the court in *McKinney upheld* a judgment creditor's lien against the survivorship interest of a spouse who held a property in tenancy by the entirety with his wife. *See id.*

In *McKinney*, the court had to decide whether a judgment creditor's lien could "levy" against the "entire interest" in the judgment debtor's property or, instead against only the judgment debtor's "separate, alienable interest in the property at the time the judgment was recorded…." *See id.* at *1. At the time the judgment was recorded, the property was held by the judgment debtor and his wife as tenants by the entirety. *See id.* As explained by the court, the essential characteristic of tenancy by the entirety is that "each spouse is seized of the whole or the entirety and not of a share, moiety, or divisible part." *See id.* (internal quotation marks omitted). The court therefore held that the judgment creditor could levy the lien only against the survivorship interest of the judgment debtor. *See id.* at *4.

In the instant case, the FTC could levy a judgment against Defendant's survivorship interest in the home. If Defendant ultimately proves to be the surviving spouse, then the FTC may have the ability to satisfy the judgment in part through the equity remaining in the home. Therefore, it remains possible that the FTC could rely on the house as an asset by which to satisfy part of a judgment, and thus the Court will not unfreeze Defendant's line of credit.[10]

c. Unfreezing Two ATVs Held in Receivership

Defendant requests that the Court unfreeze two ATVs currently held by the receivership. (Doc. No. 63-1 at 4; Doc. No. 49 at 17)[11]. He states that the vehicles are owned by Music City Ventures, Inc., but that he would like to sell them and use the proceeds to cover his living expenses. (Doc. No. 63-1 at 4). The FTC opposes his request on the same grounds as they oppose to Defendant's request to unfreeze his Savings Account and line of credit. (Doc. No. 60 at 2). The Receiver, however, provides an additional ground for opposition. Unlike the Savings Account and the line of credit, the ATVs are currently held in the receivership. (Doc. No. 62 at 5). Therefore,

---

[10] The Court notes that if this case proceeds to judgment against Defendant, the FTC will be treated as a judgment creditor under Tennessee state law. *See F.T.C. v. Olmstead*, 528 F.3d 1310 (11th Cir. 2008). (This means it would be treated like any other judgment creditor, without special status because, for example, it is a federal agency wielding a federal court judgment). Notably, its status as a judgment creditor would not necessarily elevate it above Defendant's other (non-judgment) creditors. Along the same lines, its status as a federal agency would not somehow elevate it over previously secured creditors; indeed, courts have determined that government agencies seeking remedies such as disgorgement do not receive priority over secured creditors. *See S.E.C. v. Spongetech Delivery Systems, Inc.*, 98 F. Supp. 3d 530, 546 (E.D.N.Y. 2015) ("[T]he SEC's disgorgement judgment is a general unsecured judgment and is therefore subordinate to Solution Funding's [secured] judgment."). At this stage of the litigation, the Court is not in a position to determine the priority of the FTC vis-à-vis other creditors, given, among many other things, the current uncertainty as to whether and, if so, when the FTC will obtain a judgment. Thus, the Court cannot prudently unfreeze assets to enable Defendant to make payment to his creditors (thus decreasing funds available to the FTC to secure a potential judgment) on the theory that they should be prioritized over the FTC. Further, even if the Court were in the position to unfreeze assets to enable Defendant to pay certain creditors, the Court is not aware at this juncture of a *legitimate, untainted*, source of funds—the only kind of funds the Court would venture to unfreeze at this stage—beyond (arguably) the sum of $2,500 unfrozen by this order, that could be used to satisfy Defendant's many creditors.

[11] Because the ATVs are owned by Music City Ventures, Inc. an entity-Defendant, they are property of the receivership under the Injunction. (Doc. No. 49 at 17).

as argued by the Receiver, Defendant seeks to deprive the receivership of assets, which may affect the receivership's ability to pay its own expenses. (*Id.*). The Court agrees with the FTC and the Receiver that in addition to the reasons for denying Defendant's request to unfreeze the Savings Account and line of credit, which equally apply to the ATVs[12], equity favors declining Defendant's request to take the ATVs out of the receivership to be sold to cover Defendant's personal living expenses.[13]

## CONCLUSION

For the reasons stated herein, Defendant's request to unfreeze assets in GRANTED in part and DENIED in part. Defendant is permitted to access $25,000 through his line of credit at CapStar bank for the purposes of retaining counsel. Defendant is also permitted to access a one-time withdrawal of $2,500 from the Savings Account for living expenses. Insofar as Defendant requests the additional unfreezing of assets that are currently frozen by the Injunction, his request is DENIED.

As explained by Plaintiff in Docket Entry 63, Docket Entry No. 63-1 (a signed declaration of Defendant dated December 29, 2022) serves to replace the first five pages of Docket Entry No. 54-1 (the substantively same declaration, dated January 2, 2023 and unsigned). Accordingly, the Clerk is DIRECTED to STRIKE pages 1 through 5 of Docket Entry No. 54-1.

IT IS SO ORDERED.

---

[12] Specifically, Defendant has not established that the ATVs were purchased with untainted funds and that selling them would not materially deplete the potential pool of funds for victims.

[13] To the extent that Defendant argues that he can be found individually liable only if NTV or MCV are also found liable, the Court disagrees. (Doc. No. 64-1 at 3). Even assuming Defendant is correct that individual liability under the FTC Act exists only when an individual participates directly in the unlawful practices or had authority to control them (*id.*), the Court is not persuaded (and Defendant has not established) that this necessarily means that the individual in question must be an owner of the corporation in question. It seems plausible that an individual with no ownership stake in a company could meet the standard of individual liability put forth by Defendant.

_____
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE